# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

In re:

RICHARD M. OSBORNE,

               Debtor.

Case No. 17-17361-aih

Chapter 11

Judge Arthur I. Harris

## FIRST NATIONAL BANK OF PENNSYLVANIA'S
## MOTION TO APPOINT A CHAPTER 11 TRUSTEE

First National Bank of Pennsylvania ("**_FNB_**"), successor by merger to Park View Federal Savings Bank ("**_Park View_**"), by and through its undersigned counsel, respectfully moves this Court for the appointment of a trustee pursuant to § 1104(a) of Title 11 of the United States Code ("**_Bankruptcy Code_**").

## PRELIMINARY STATEMENT

Richard M. Osborne, debtor and debtor-in-possession in the above-captioned chapter 11 case ("**_Debtor_**"), is unfit and cannot be trusted to fulfill the duties required of a chapter 11 debtor. In his Schedules of Assets and Liabilities ("**_Schedules_**"), as the same have been amended from time to time, Debtor has disclosed an ownership interest in 193 separate entities[1] that he has been using and continues to use to perpetrate a "shell game" for his own benefit at the expense of his creditors and other parties in interest. Debtor's actions both pre- and post-petition have made it abundantly clear that corporate formalities and distinctions among corporate insider entities are not followed and that the Debtor is willing to completely ignore the rules prescribed by the Bankruptcy Code. And, as this Court has previously noted, "in

---

[1] See Debtor's Amended Schedules filed April 5, 2018 [dkt # 98], pages 80-84.

bankruptcy these different affiliates and corporate entities and ownership interests make a difference ...".[2] Before and during the course of this chapter 11 case, Debtor has been commingling funds, ignoring corporate formalities of the various entities in which he has membership interests and controls, concealing assets, and generally entangling the estate's assets with assets of non-debtor insiders to the extent it is nearly impossible to decipher which assets are estate property and which are not.

If his actions are not a deliberate fraud, then Debtor's conduct in this constitutes a severe breach of the fiduciary duties he owes as a debtor-in-possession. Accordingly, cause exists for the appointment of a Chapter 11 trustee. Moreover, the appointment of a Chapter 11 trustee is in the best interests of creditors. Consequently, for all the reasons stated herein, a Chapter 11 trustee should be appointed.

## BACKGROUND

1.  FNB is the successor by merger to Park View, which merger became effective on October 12, 2013.

2.  On December 17, 2017 (the "***Petition Date***"), Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code thereby commencing the above-captioned Chapter 11 case (the "***Case***") to halt a contempt hearing in the State Court Action (defined below) in which the Receiver (defined below) was appointed as receiver over all of Debtor's assets, both real and personal, as well as the assets of certain insiders controlled by Debtor.

---

[2] See January 23, 2018 hearing on the *Application to Employ Special Counsel* [dkt #23] (OTP case), page 28, lines 14-16.

## A.   Debtor's Obligations to FNB

3.      Park View entered into various commercial loans relating to and otherwise establishing lending relationships with Debtor, and numerous insiders, including, but not limited to, the Richard M. Osborne Trust  ("**Osborne Trust**"), Rigrtona Trust ("**Rigrtona Trust**")[3], Junior Properties, Ltd. ("**Junior Properties**"), Orwell-Trumbull Pipeline Co., LLC  ("**OTP**")[4], Chowder Gas Storage Facility, LLC ("**Chowder**")[5], Lake Shore Gas Storage, Inc.  ("**Lake Shore**")[6], Heisley Hopkins, Inc. ("**Heisley Hopkins**"), Black Bear Realty, Ltd. ("**Black Bear**"), and Hamilton Partners, Inc. ("**Hamilton Partners**").   Debtor and the foregoing insiders are collectively referred to as the "**Obligors**."

4.      On August 31, 2009, Debtor and each of the other Obligors executed a certain Omnibus Guaranty and Cross Collateralization Agreement (the "**Omnibus Agreement**") in favor of Park View.   A true and correct copy of the Omnibus Agreement is attached hereto as <u>Exhibit 1</u>.

---

[3] FNB learned that Debtor revoked the Osborne Trust and Rigrtona immediately before filing his voluntary petition. The Court of Common Pleas, Cuyahoga County, Ohio, in case no. CV-14-822810, subsequently issued a journal entry finding such revocation of the trusts were a violation of its receivership order.  Specifically, on December 21, 2017, the State Court (defined below) held, in pertinent part, "WITH RESPECT TO THE RICHARD OSBORNE TRUST, COUNSEL FOR OSBORNE STATED ON THE RECORD THAT THE TRUST WAS REVOKED PRIOR TO THE FILING OF BANKRUPTCY. THE COURT BELIEVES THIS TO BE A VIOLATION OF ITS ORDER AND BELIEVES THAT THE CONTENTS OF THE TRUST SHOULD BE RETURNED TO THE RECEIVER. HOWEVER, THIS COURT WILL DEFER TO THE BANKRUPTCY COURT ON THIS MATTER...."

[4] OTP initiated its own bankruptcy case before this Court on December 4, 2017, by filing its voluntary petition in the case assigned case no. 17-17135-aih. OTP's bankruptcy case was dismissed on February 9, 2018.

[5] Chowder initiated its own bankruptcy case before this Court on December 9, 2017, by filing its voluntary petition in the case assigned case no. 17-17245-aih. This Court determined that a chapter 11 trustee was appropriate in that case and appointed such a trustee in Chowder's bankruptcy case on July 30, 2018.

[6] Lake Shore initiated its own bankruptcy case before this Court on December 9, 2017, by filing its voluntary petition in the case assigned case no. 17-17246-aih. This Court determined that a chapter 11 was appropriate in that case and appointed such a trustee in Lake Shore's bankruptcy case on July 30, 2018.

5.     Pursuant to the terms of the Omnibus Agreement, the Obligors each agreed to jointly and severally guaranty the payment obligations of each other due and owing to Parkview (collectively, the "***Obligations***") and to cross-collateralize Park View's security interests in various collateral granted with respect to certain loans and other obligations of the Obligors and certain affiliated entities.

6.     Following the execution of the Omnibus Agreement, Park View and the Obligors entered into various Reinstatements, Extensions and Modifications relating to the loans that were the subject of the Omnibus Agreement, including that certain Loan Reinstatement, Extension and Modification Agreement dated April 15, 2010; that certain Agreement for Modification and Extension of Loans dated January 19, 2011; and that certain Second Agreement for Modification and Extension of Loans dated March 29, 2013 (collectively, the "***Modifications***").     True and correct copies of the Modifications are attached hereto as <u>Exhibit 2</u>.

7.     The Obligors failed to pay the Obligations under the various loan documents including the Omnibus Agreement and the Modifications.

**B.     The State Court Case**

8.     On March 3, 2014, Debtor and the other Obligors initiated a law suit against Park View in the Court of Common Pleas, Cuyahoga County, Ohio (the "***State Court***") in the case assigned case number CV-14-822810 (the "***State Court Action***"). In the State Court Action, Debtor, as plaintiff, sought a declaratory judgment to enforce the "special relationship" he enjoyed with Park View and to specifically prohibit FNB from transferring its loans with Debtor and the Obligors.

9.     Consequently, FNB filed a counterclaim seeking judgment against Debtor and the Obligors.

4

10.     On September 15, 2017, the Obligations were reduced to a money judgment (the "***Judgment***") pursuant to an award of damages issued by the State Court in the State Court Action, against the Obligors, jointly and severally, and in favor of FNB in the total amount of $10,669,464.77, plus applicable interest.  Additionally, the State Court awarded FNB its reasonable attorneys' fees and legal expenses totaling $474,405.28.  A true and correct copy of the Judgment is attached hereto as <u>Exhibit 3</u>.

11.     On October 30, 2017, November 1, 2017, and November 21, 2017, the State Court issued two interim and a final order (collectively, the "***Receiver Orders***") appointing Zachary B. Burkons as receiver (the "***Receiver***") over all property, both real and personal, of the Obligors.  True and correct copies of the Receiver Orders are attached hereto as <u>Exhibit 4</u>.

12.     Under the Receiver Orders, the Receiver was ordered and directed to take and have complete and exclusive possession, control, and custody of all property of the Obligors, both real and personal.

13.     Additionally, the Obligors, and all those who are under the direction or control of the Obligors, were "enjoined and restrained from transferring, selling, leasing, assigning, conveying, encumbering, or otherwise parting with any interest of the [Obligors] (or any of them) in or to any of the Receivership Property [and any attempt to transfer, sell, lease, assign, convey, encumber, or otherwise part with any interest of the [Obligors] (or any of them) in or to any of the Receivership Property hereby shall be and is null and void]...."  See *Id.*, Receiver Order dated November 21, 2017, pgs. 10-11, ¶ 10(D).

14.     Further, under the Receiver Orders Debtor was "ordered to fully and completely cooperate with the Receiver and to surrender and deliver to the Receiver" all

5

Books and Records (defined therein) and all Revenues (defined therein), among other things.

15.     Debtor did not comply with these provisions of the Receiver Orders, did not cooperate with the Receiver, and failed to turn over a single document or dollar.

16.     On December 7, 2017, the Receiver filed a motion seeking an order from the State Court compelling Debtor and the then non-debtor Obligors[7] to show cause as to why they should not be held in contempt of the State Court for failing to comply with the Receiver Orders.

17.     The hearing on the Receiver's motion to show cause before the State Court was scheduled for Monday, December 18, 2017.  On December 17, 2017, the day prior to the initially scheduled contempt hearing before the State Court, Debtor revoked both the Osborne Trust and the Rigrtona Trust in violation of the Receiver Orders and initiated this Case.  The State Court subsequently held that Debtor's prepetition revocation of the Osborne Trust and Rigrtona Trust constituted an impermissible transfer of property in violation of the injunctive provisions of the Receiver Orders[8].  Pursuant to the explicit language of the Receiver Orders, the attempted transfer of the trust property to Debtor is null and void.

C.     **The Bankruptcy Case**

18.     Debtor initiated this Case on the Petition Date.

---

[7] At the time, OTP had filed its bankruptcy case.

[8] FNB learned that Debtor revoked the Osborne Trust and Rigrtona Trust immediately before filing his voluntary petition. The Court of Common Pleas, Cuyahoga County, Ohio, in case no. CV-14-822810, subsequently issued a journal entry finding such revocation of the trusts were a violation of its receivership order.  Specifically, on December 21, 2017, the State Court (defined below) held, in pertinent part, "WITH RESPECT TO THE RICHARD OSBORNE TRUST, COUNSEL FOR OSBORNE STATED ON THE RECORD THAT THE TRUST WAS REVOKED PRIOR TO THE FILING OF BANKRUPTCY. THE COURT BELIEVES THIS TO BE A VIOLATION OF ITS ORDER AND BELIEVES THAT THE CONTENTS OF THE TRUST SHOULD BE RETURNED TO THE RECEIVER. HOWEVER, THIS COURT WILL DEFER TO THE BANKRUPTCY COURT ON THIS MATTER...."

19.     On January 17, 2018, a month after the Petition Date, Debtor filed his initial Schedules [dkt # 29].  Thereafter, on February 26, 2018 and February 28, 2018, Debtor filed amended Schedules and supporting documents [dkt # 53, 55 and 56].  On March 2, 2018, Debtor's first 341 meeting of creditors was conducted.[9]  Subsequently, on each of  March 12, 2018, and April 5, 2018, Debtor filed further amended Schedules [dkt # 69, 72, and 98].  On July 12, 2018, a continued 341 meeting was conducted.

20.     Despite the foregoing, Debtor failed to disclose significant assets of the estate on his Schedules, failed to disclosure transfers to insiders, and has generally conducted himself and his business in a manner which is unfit to act as a debtor-in-possession.

21.     During the course of this Case, Debtor repeatedly has engaged in conduct that is detrimental to the estate and its creditors by among, other things, concealing assets, controlling non-debtor affiliates/insiders in such a way that diminishes the value of those entities and ultimately the estate, attempting to purchase assets of the estate post-petition by using non-debtor affiliates/insiders to complete those transactions, and commingling funds and assets of non-debtor insiders so that it is nearly impossible to determine which assets belong to the estate and which do not.  Accordingly, Debtor cannot be trusted to fulfill the fiduciary duties he owes to the estate, and the appointment of a chapter 11 trustee is required.

---

[9] Unfortunately, there is no transcript of the first 341 meeting of creditors as the meeting was not recorded. *See* dkt. # 58.

# LAW AND ARGUMENT

## A. Standards Governing the Appointment of a Chapter 11 Trustee

22. It is well recognized that a debtor-in-possession owes certain fiduciary duties to the bankruptcy estate and must, among other things, "protect and . . . conserve property in [its] possession for the benefit of creditors" and "refrain [] from acting in a manner which could damage the estate, or hinder a successful reorganization. . .". *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990) (quoting *In re Sharon Steel Corp.*, 86 B.R. 455, 457 (Bankr. W.D.Pa. 1988)). "The willingness of Congress to leave a debtor-in-possession is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee." *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989).

23. In this instance, Debtor repeatedly has shown that he is unwilling and/or incapable of fulfilling the duties of a debtor-in-possession. Accordingly, the appointment of a chapter 11 trustee is required.

24. Section 1104(a) of the Bankruptcy Code provides for the appointment of a chapter 11 trustee for cause or if such appointment is in the best interests of creditors. Specifically, § 1104(a) of the Bankruptcy Code provides in pertinent part as follows:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee —
>
> > (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause … ; or

8

> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate....

25. Each of the subsections of § 1104(a) provide independent bases for the appointment of a trustee." *See In re Lowenschuss*, 171 F.3d 673, 685 (9th Cir. 1999). In this case, there is sufficient justification for the appointment of a trustee under either subsection of section 1104(a).

## B. The Appointment of a Trustee is in the Interests of Creditors

26. Pursuant to section 1104(a)(2) of the Bankruptcy Code, a chapter 11 trustee shall be appointed when it is in the best interests of creditors to do so. 11 U.S.C. § 1104(a)(2). This subsection provides a "flexible standard for appointment of a trustee even when no cause exists." *See Bellevue Place Assocs.*, 171 B.R. at 623; *see also In re V. Savino Oil & Heating Co.*, 99 B.R. at 527 fn.11 ("factors constituting a basis for appointing a trustee under § 1104(a)(2) are amorphous, diverse, and necessarily involve a great deal of judicial discretion."). The Court has "particularly wide discretion" to look to the practical realities and necessities involved in appointing a trustee. *See Bellevue Place Assocs.*, 171 B.R. at 623.

27. The determination of whether the appointment of chapter 11 trustee is in the interests of creditors and the estate entails the exercise of a spectrum of discretionary powers and equitable considerations. *Petit v. New England Mortg. Services Inc.*, 182 B.R. 64, 69 (D. Me. 1995) (citing *In re V. Savino Oil & Heating Co.*, 99 B.R. 518 at 525). The courts must determine on a case-by-case basis whether the circumstances of each bankruptcy require the appointment of a trustee. *Petit*, 182 B.R. at 69 (citing *In re Sharon Steel*, 871 F.2d at 1226).

28.     Factors that are often used to determine whether appointment of a chapter 11 trustee is in the best interests of the creditors include: (1) the debtor's trustworthiness; (2) the debtor's past and present performance and prospects for the debtor's rehabilitation; (3) the confidence, or lack thereof, of the business community and creditors in present management; and (4) the benefits derived by the trustee's appointment, balanced against the cost of appointment. *See In re Ionosphere Clubs, Inc.*, 113 B.R. at 168; *In re Madison Mgmt. Group, Inc.*, 137 B.R. 275, 282 (Bankr. N.D. Ill. 1992).

29.     This list is not exhaustive; rather, it merely suggests common factors used in a court's exercise of its broad discretion.  When evaluating Debtor's conduct in this Case, both past and present, each of these factors weighs in favor of the appointment of a trustee.  Additionally, many of the acts referenced in this motion would constitute "cause" on their own accord for the appointment of a trustee.   Notwithstanding, when taken collectively, it is abundantly clear that Debtor is not fit to serve as a fiduciary; and in this case, "the appointment of a trustee is a power which is crucial for the Court to exercise in order to preserve the integrity of the bankruptcy process and to insure that the interests of creditors are served." *In re Intercat, Inc.*, 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000).

30.     The following factual examples of Debtor's conduct, both past and present, militate in favor of the appointment of a chapter 11 trustee.  Like the factors referenced above for determining whether the appointment of a trustee is in the best interests of creditors, these examples are not an exhaustive list.  Instead, they are a few examples that demonstrate that this Debtor (i) is dishonest, (ii) is willing to act outside the confines of the Bankruptcy Code, and (iii) simply cannot (and should not) be trusted to

10

maintain control of the bankruptcy estate and its affairs. Much of this conduct fits into more than one factor or falls under more than one label used to described cases in which the appointment of a trustee is appropriate. No matter which factor these examples of conduct are applied to, and no matter what label is assigned to them, the following clearly demonstrate the need for appointment of a chapter 11 trustee.

### (i) Debtor Vindictively Exerted His Control Over a Non-debtor Insider to Harm Third-Parties Simply Out of Acrimony Towards FNB and the Receiver

31. Debtor, through his control of a non-debtor insider, has—out of spite or acrimony towards the Receiver and FNB—potentially crippled two unrelated small businesses that each have an eight or nine year relationship with Debtor. Days before his continued 341 meeting of creditors, Debtor displayed his inability to act in a fiduciary capacity, and further portrayed his belief that his various insider entities are nothing more than an extension of himself. Specifically, Debtor testified as follows:

> MR. SINN: Now, the property at 3511 Lost Nation Road.
>
> DEBTOR: Right.
>
> MR. SINN: That is [OTP's] office location, is that correct?
>
> DEBTOR: Oh, it was. I don't know if they're in there now.
>
> MR. SINN: Which of your businesses were at, if you will --
>
> DEBTOR: Cobra and [OTP].
>
> MR. SINN: Are there other tenants on that property?
>
> DEBTOR: Yeah. Down below.
>
> MR. SINN: Is it a bar? Is that correct?
>
> DEBTOR: Yeah, a bar and an employment agency. Joe's getting ready to file a foreclosure on the property, because my ex-wife has a -- has a mortgage on it.[10]

---

[10] The property located at 3511 Lost Nation is property of the receivership estate in the State Court Action and under the possession and control of the Receiver. It is not lost on FNB that Debtor is referencing another insider who intends to file an action adverse to FNB and the Receiver. Such action was eventually filed by Debtor's ex-wife

MR. SINN: On what, 3511 Lost Nation Road?

DEBTOR: Right. Yeah.

MR. SINN: The property was owned or is owned by [OTP]?

DEBTOR: Right.

MR. SINN: Are there written leases with the tenants?

DEBTOR: No. There were no leases.

MR. SINN: Now, the property has a small parking lot out in front?

DEBTOR: Right.

MR. SINN: But there's a large parking lot adjacent?

DEBTOR: Right.

MR. SINN: Who owns that parking lot adjacent?

DEBTOR: Great Lakes Parkway, LLC.

MR. SINN: How long have those two tenants been there?

DEBTOR: They've probably been there, you know, eight years, nine years.

MR. SINN: What is the parking lot owned by Great Lakes? What's that used for?

DEBTOR: Nothing. For nothing. I mean, you know, they used it for parking.

MR. SINN: Who used it for parking?

DEBTOR: The tenants, [OTP] and Cobra. But I blocked it off about two, three days ago.

MR. SINN: Why did you block it off?

DEBTOR: Well, I'm not going to let them use it. They don't own it. It's mine, you know.

MR. SINN: But you were the majority owner of [OTP]. That's correct right?

DEBTOR: Now?

MR. SINN: Well, yeah. Technically now you would still be.

---

before the Court of Common Pleas, Lake County, Ohio, case no. 18CF001288, without leave of the State Court whom has exclusive *in rem* jurisdiction over the receivership estate. Not surprisingly, the State Court subsequently determined that the filing of the aforementioned case was in violation of the Receivership Orders.

| | |
|---|---|
| DEBTOR: | I don't know if I am the owner. I mean, Burkons is running it, you know. Shit. |
| MR. SINN: | Prior to the receivership you were the owner, correct? |
| DEBTOR: | Right. |
| MR. SINN: | So for eight or nine years you allowed tenants to park in the adjacent lot? |
| DEBTOR: | That's right. Sure. Yeah. It's all one. |
| MR. SINN: | But now they don't own it, so they can't park there? |
| DEBTOR: | Right, you know. |
| MR. SINN: | Did you inform the tenants of this? |
| DEBTOR: | No. I don't have to. You know, I informed -- I informed -- I had Wuliger call Burkons' attorney and inform him, you know. |
| MR. SINN: | Does Mr. Wuliger do any work for you personally? |
| DEBTOR: | Who? |
| MR. SINN: | Bill Wuliger. His law firm. |
| DEBTOR: | Does he do any work for me personally? |
| MR. SCHWIEG: | Not yet. |
| MS. GIANNIRAKIS: | We need to -- you can't answer. |
| MR. SCHWIEG: | Okay. |
| DEBTOR: | I don't think he does anything now for me personally. |
| MR. SINN: | If he called the receiver's counsel, who was he representing? |
| DEBTOR: | Probably Great Lakes Parkway, LLC. |
| MR. SINN: | That's 100 percent owned by you? |
| DEBTOR: | Yes. |

(July 12, 2018, Continued 341 Meeting of Creditors, page 81, line 16 page 84, line 19. A true and correct copy of the relevant pages of the foregoing transcript are attached hereto as <u>Exhibit 5</u>).

13

32.     Despite Debtor's testimony to the contrary, there are written leases between OTP and the two tenants.  True and correct copies of the leases are attached hereto as Exhibit 6.

33.     Debtor, through his control of the non-debtor insider Great Lakes Parkway, LLC, has since required monthly rent from the two tenants in order to continue to utilize the parking that Debtor previously provided to them, without charge, for the past eight or nine years.  Doing so is not only harming the businesses and increasing the chance for a turnover in tenants, Debtor's conduct also decreases the value of the building.

34.     Even though this new "rent" payment is made to Great Lakes Parkway, LLC, Debtor deposits the rent into a deposit account with Erie Bank maintained by OsAir, Inc. ("*OsAir*").  True and correct redacted copies of checks from Permanent Solution Staffing, LLC made payable to Great Lakes Parkway, LLC are attached hereto as Exhibit 7.

35.     Debtor's actions are always self-interested, rarely – if ever – done in the interests of his creditors, and always involve the entanglement of Debtor's conglomerate of affiliated entities/ insiders.

**(ii)     Debtor Attempted to Waive the Automatic Stay at the Outset of this Case Without Notice to Creditors in Order to Purchase Estate Property Via Credit Bid at Sheriff Sale**

36.     Immediately after filing this case, Debtor attempted to voluntarily waive the automatic stay in this Case without providing notice to his creditors in order to purchase property of the estate through a non-debtor insider via credit bid.

37.     Prior to the Petition Date, one of Debtor's properties located at 7000 Fracci Court, Mentor, Ohio (the "*Fracci Court Property*") was the subject of a

foreclosure proceeding before the Court of Common Pleas, Lake County, Ohio, known as *CF Bank v. Richard M. Osborne, Trustee, et al.*, and assigned case number 15CF001708. Upon information and belief, CF Bank held the senior lien, save and except for the high balance of accrued unpaid real estate taxes and tax certificates. On August 1, 2016, Debtor settled CF Bank's claim, and CF Bank allegedly transferred its interests in its judgment and mortgage to a non-debtor insider, 7001 Center Street LLC ("*7001 Center Street*").[11]

38. On January 17, 2018, Debtor appeared at the Lake County Courthouse with the intent to purchase the Fracci Court Property on behalf of 7001 Center Street via credit bid at the Sheriff sale scheduled to commence at 10:00 a.m. that morning. A true and correct copy of the response of the Lake County, Ohio Sheriff's department to a Public Records Request made on January 22, 2018 by FNB is attached hereto as <u>Exhibit 8</u>.

39. The Lake County, Ohio Sheriff's department refused to conduct the scheduled sale of the Fracci Court Property due to the automatic stay of this Case. Debtor was "not happy" and "upset" by this. Debtor proceeded to deliver to the Lake County Sheriff's department a handwritten piece of yellow book paper stating "IV'ED (sic) WAIVED MY STAY", underscored and with Debtor's signature. A true and correct copy of the handwritten statement from Debtor to the Lake County Sheriff Department. Is attached hereto as <u>Exhibit 9</u>. Despite this unilateral attempt to waive the automatic stay without notice to this Court or Debtor's creditors, the Lake County, Ohio Sheriff's department still refused to conduct the sale.

---

[11] The factual allegations concerning the foreclosure of the Fracci Court Property were asserted by Debtor in his motion with this Court seeking to the Fracci Court Property filed on February 20, 2018 [dkt. # 47].

40. Following the conclusion of the other scheduled Sheriff sales, Debtor "began his verbal attack again" on the employees of the Lake County Sheriff's Department who refused to conduct the Sheriff sale of the Fracci Court Property, thus foiling the attempt of non-debtor insider 7001 Center Street to acquire the Fracci Court Property in violation of the automatic stay of this Case.

**(iii)   Debtor Has Attempted to Conceal Assets and Transfers**

**(a)   Debtor Failed to Disclose the Boat Sitting in his Garage in his Schedules Despite Amending His Schedules Several Times**

41. Debtor failed to disclose that he owns a 22-23' foot boat. The boat is not docked in some obscure location, rather its sitting in the garage of the property he claimed as his residence when he filed the voluntary petition in this Case. When specifically questioned about the boat, Debtor testified as follows:

| | |
|---|---|
| MS. GIANNIRAKIS: | Do you have a boat? |
| DEBTOR: | Yes. |
| MS. GIANNIRAKIS: | I don't believe it was listed. What kind of boat? |
| DEBTOR: | Well, it's a 22 or 23 foot. It might be a – I don't know if it's a -- you know, I haven't used it this year. |
| MS. GIANNIRAKIS: | Where is it? |
| DEBTOR: | It's in my garage in Waite Hill. |

***

| | |
|---|---|
| MR. SINN: | So you testified earlier that you have a boat. |
| DEBTOR: | Uh-huh. |
| MR. SINN: | Where's that boat docked at? |
| DEBTOR: | It's not docked. I didn't use it this year. It's at my house. |
| MR. SINN: | When you say your house, are you referring to -- |
| DEBTOR: | Markell Road, yeah. |

***

16

MR. SINN:  *** When was the boat purchased?

DEBTOR:  About three years ago.  $25,000 it was.

(Ex. 5 at page 12 24-page 13, line 7; page 72, lines 6-22).

### (b) Debtor Failed to Disclose the "Blob" on his Statement of Financial Affairs

42.  Debtor failed to disclose the "around $80,000" he and two of his children shared in from the sale of a gold nugget, referred to as the "blob," within the two years prior to his petition date.  When questioned about the blob, Debtor testified as follows:

MS. GIANNIRAKIS:  Okay.  Tell me about the blob.

DEBTOR:  Okay.  I have all of the details and everything on it, but we decided, all of the executors, to auction off all of my mother's jewelry.  And in this too was -- we call it the blob.  So --

MS. GIANNIRAKIS:  So my –

DEBTOR:  It was –

MS. GIANNIRAKIS:  Go ahead.

DEBTOR:  It was, I mean, it was about that big and where he got it from, I don't know.  He was in – my father was one of the original investors of Mel Fisher in Key West when they -- you know, he wasn't on the -- he was in on the one before that.

So I bought it.  I think I paid $3,000 for it.  And my son, who's a geologist, you know, I said to him --

MS. GIANNIRAKIS:  Ricky?

DEBTOR:  Ricky.

MS. GIANNIRAKIS:  Because you have more than one son.

DEBTOR:  I said, "Let's see what it's worth."  You know.  I said, "Whatever I get, I'll split it with you."

So I think we got around $80,000 and it was from a company over in Cleveland.  And so he got the -- we got the check.  And I said, "Well if you give your sister 9,000 of the 40,000 you got."

17

|  |  |
|---|---|
|  | He said, "No problem." So .... |
| MS. GIANNIRAKIS: | But you gave him -- so then you gave her 9,000 and you gave him -- |
| DEBTOR: | Yeah. |
| MS. GIANNIRAKIS: | -- 31,000? |
| DEBTOR: | Yeah. Around that, yeah. |
| MS. GIANNIRAKIS: | And then you kept the other half? |
| DEBTOR: | His 40,000, yes. |
| MS. GIANNIRAKIS: | None of that was disclosed on your schedule. |
| DEBTOR: | Pardon? |
| MS. GIANNIRAKIS: | None of that was disclosed in your schedule. |
| DEBTOR: | Yeah. Well, that was before -- I think before the bankruptcy. |
| MS. GIANNIRAKIS: | But it was within the two years? |
| DEBTOR: | Yeah. Well, you know, we missed it. |
| MS. GIANNIRAKIS: | That's a big miss. |
| DEBTOR: | Actually, the person who picked it up was my son's bankruptcy attorney. He's the one that, you know, picked the blob up, you know. I didn't even think about it. |

(Ex. 5 at page 32, line 1 – page 33, line 23).

43.     Actually, the person who "picked it up" was not Debtor's son's bankruptcy attorney, rather it was Debtor's son's chapter 7 trustee. In fact, on November 28, 2018, the United States Trustee initiated an adversary proceeding against Debtor's son to revoke his discharge pursuant to § 727(d) of the Bankruptcy Code.[12]

---

[12] See *In re: Richard McKay Osborne, Jr. and Tricia A. Osborne*, case no. 17-14920-aih [dkt. # 69]; see also *Daniel M. McDermott, United States Trustee v. Richard McKay Osborne, Jr. and Tricia A. Osborne*, adversary case no. 18-01124.

18

> **(c)** **Debtor Failed to Disclose the Transfer of the Sugar Bush Lots to His Daughter, Which Were Subsequently Sold Outside of this Case, the Proceeds of Which Went to Non-debtor Insiders and to Pay an Antecedent Debt Owed to Professionals**

44.     Debtor failed to disclose the transfer of seven vacant real estate lots (the "***Sugarbush Lots***") to his daughter Beth.  Debtor testified as follows:

| | |
|---|---|
| MS. GIANNIRAKIS: | Okay.  In the statement of financial affairs, there's a question which asks if you in the two years prior to the filing, if you gave a gift to anyone over $600.  Your answer was no. |
| | Did you give a gift to anyone in the two years prior to the filing over $600? |
| DEBTOR: | Yes, I did. Yeah. |
| MS. GIANNIRAKIS: | What did you give? |
| DEBTOR: | Well, I gave it -- I gave the seven Sugarbush lots to my daughter Beth.  And then rather than get in an argument over them, we just, you know, transferred them back to Sugarbush. |
| MS. GIANNIRAKIS: | When? |
| DEBTOR: | It might have been about the time we sold it, you know. |

***

| | |
|---|---|
| MS. GIANNIRAKIS: | So you gave the Sugarbush lots.  The seven sublots, is that what you're talking about? |
| DEBTOR: | Yeah.  I gave them to her maybe a year and a half ago, you know. |

(Ex. 5 at page 30, line 10-24; page 31, lines 13-16.)

45.     Debtor sold the Sugarbush Lots post-petition.

46.     Despite Debtor's testimony that "I gave the seven Sugarbush Lots to my daughter Beth ... And then rather than get in an argument over them, we just, you know, transferred them back to Sugarbush," at the time of their sale around April 4, 2018,  the record title owner of the Sugarbush lots was Louis V LLC ("***Louis V***"), not Sugarbush

19

Properties LLC ("**Sugarbush**").  Louis V is an entity allegedly owned solely by Debtor's daughter, Beth Osborne.  A true and correct copy of the Warranty Deed conveying the Sugarbush Lots from Louis V is attached hereto as <u>Exhibit 10</u>.

47.     The closing statement from the sale of the Sugarbush Lots demonstrates that Louis V was indeed the title owner.  In fact, Louis V received net proceeds from the sale of the Sugarbush Lots in the amount of $37,245.98.  A true and correct copy of the closing statement from the sale of the Sugarbush Lots is attached hereto as <u>Exhibit 11</u>.

48.     The secrecy engulfing the Sugarbush Lots transaction is not simply the undisclosed pre-petition transfer to Louis V and the resulting proceeds from the sale.  Rather, as the closing statement discloses, an arbitrary $75,000 was paid to non-debtor insider OsAir as a "Termination of Oil and Gas Fee."  See Ex 11, page 2.

49.     Additionally, $36,000 was paid to the law firm Wuliger & Wuliger.  See Ex 11, page 2. Upon information and belief, Debtor is using the sale of assets outside of the purview of this Court, through multiple non-debtor insiders (including, but not limited to, Sugarbush, Yellowbrick, OsAir, Hamilton-Mercantile, and 8667 East Ave.), to make a payment toward an antecedent debt owed to a friendly creditor.  The Wuliger law firm is owed a significant amount of money from Debtor and various non-debtor insiders.  (*See* the Verified Statement of William T. Wuliger, Esq., in support of Debtor's Motion to Employ  William T. Wuliger, Esq. as Special Counsel [dkt # 266], pages 7-8).

### (iv)     Debtor Comingles Funds and Orchestrates Habitual Insider Transfers With No Expectation of Repayment

50.     Debtor's standard business practice is for insiders to freely share in funds.  Funds are freely transferred from one insider to another, and accounted for as loans.

17-17361-aih    Doc 308    FILED 12/11/18    ENTERED 12/11/18 02:12:27    Page 20 of 46

These loans carry no repayment terms of any kind, and are never repaid. These actions diminish the value of the insiders to the detriment of the Debtor's estate and creditors.

51. Debtor himself, and employees of Debtor and/or Debtor's insiders have testified in various proceedings before this Court as follows concerning the rampant use of intercompany transfers between insiders:

July 12, 2018, Continued 341 Hearing

| | |
|---|---|
| MR. BAIN: | Can you recall that in March 2018 that you authorized Don Whiteman or Sherry Phillips to make cash payments to four employees totaling $1,700? |
| DEBTOR: | No. |
| MR. BAIN: | Would you ever have made that authorization or direction to -- |
| DEBTOR: | Yeah, I could have. Yes, I could have. |
| MR. BAIN: | Okay. Where would Sherry or Don have received the cash? |
| DEBTOR: | OsAir. |
| MS. GIANNIRAKIS: | I'm sorry. I didn't hear that answer. OsAir? |
| MR. SCHWIEG: | OsAir. |
| DEBTOR: | OsAir. |
| MR. BAIN: | How do you know that? |
| DEBTOR: | Well, that's where it usually comes out of. |

*** 

| | |
|---|---|
| MR. SINN: | If one of your companies was running short on cash, for example, said they needed to make payroll, how would they do it? |
| DEBTOR: | Take it from the other company. |
| MR. SINN: | Was that then reflected on the company's books? |
| DEBTOR: | Yeah. Yeah. |

(Ex. 6 at pages 43, line 25 – page 44, line 16; page 79, lines 12-17).

*** 

| | |
|---|---|
| MR. SINN: | What if Cobra employees -- you need to make payroll from Cobra, where does that money come from? |

21

| DEBTOR: | Well, they're making their own payroll now, you know. |
|---|---|
| MR. SINN: | But your past practice was whoever had the money would cover the shortfall for the other company? |
| DEBTOR: | Yeah. Yeah. |

(Ex 5, at page 80, lines 4-12).

*In re: Orwell-Trumbull Pipeline Co.*, January 25, 2018, 341 Meeting of Creditors

| MS. GIANNIRAKIS: | Okay. So at the time of filing you listed accounts receivable of $5,193,459. I'm sorry, in the face amount. |
|---|---|
| MS. COATOAM: | Yes. |
| MS. GIANNIRAKIS: | Okay. So 4.5 million of that is doubt or uncollectible. |
| MS. COATOAM: | It's basically intercompany. |
| MS. GIANNIRAKIS: | Those are all intercompany? |
| MS. COATOAM: | Yes. |
| MS. GIANNIRAKIS: | And how was that tracked? |
| MS. COATOAM: | All of the intercompany accounts have a separate account in the accounts receivable, so you can see what it is. |
| MS. GIANNIRAKIS: | Well, why are they uncollectible? |
| MS. COATOAM: | At this point we assume that we won't get the money from them. Most of them are -- some of them are, you know, Chowder and Lake Shore Gas. |
| MS. GIANNIRAKIS: | And how was that money transferred back and forth between the accounts? Between companies. I'm sorry. |
| MS. CAROTHERS: | Anything that's out of the Lost Nation office, which includes Cobra Pipeline Company. |
| MS. GIANNIRAKIS: | Okay, wait a minute. Lost Nation, Cobra. |
| MS. CAROTHERS: | [Lake Shore], [Chowder] and then [OTP], anything out of those companies I have the ability to do online transfers. And in the past they had been treated like one company. So if we were in need to write any checks for Cobra and [OTP] had the funds, it would be transferred to Cobra and accounted for. And then if -- when it went the other direction, it would be the same thing, where a transfer would be done and accounted for. It's printed. Any transfers that are done, it's given to the bookkeeper |

and it's applied to any outstanding invoices that are due or if the transfer is greater than the invoices that are due, then a receivable is booked.

MS. GIANNIRAKIS:     So is it safe to say that if money was due, whoever had the money paid it?

MS. CAROTHERS:     That's exactly right.

***

MS. CAROTHERS:     I don't know what was done with the money after the -- so, for instance, if we were to cut a check to another company, whether it be [Debtor], or it would be to OsAir, another one of [Debtor's] companies, I don't know what happened with that, those funds after. I just know that it was cut to whatever entity and then logged on our system.

***

MR. SINN:     Now, for the intercompany transactions that you referred to as a loan, are there any terms for those loans?

MS. CAROTHERS:     No.

MR. SINN:     So there's no interest rate, payment terms?

MS. CAROTHERS:     No.

MS. COATOAM:     No.

MR. SINN:     So treating them as a loan is truly just an accounting function?

MS. CAROTHERS:     That's correct.

MR. SINN:     Now, the cash disbursements that you attached to your schedules shows 214,000, roughly, disbursements to Cobra Pipeline. It looks like there was about $200,000 worth of disbursements in a three-month period. Do you guys recall what the reason for that was? I mean, it's December 16 running through April of '17.

MS. CAROTHERS:     That sounds right. Like we had said earlier, the payments come in at different times, so -- for [OTP] and Cobra. So transfers are made back and forth to pay whatever needed to be done in the account that needed it at that time.

***

MR. SINN:     It's safe to say, though, the money moves back and forth between those companies on a regular basis?

MS. COATOAM:     Yes.

MS. CAROTHERS:     That's correct.

23

MR. SINN:        What are the disbursements to Lake Shore Gas Storage for?

MS. CAROTHERS:      Lake Shore Gas Storage has no revenue, so any -- anything that needs to be paid is transferred from Orwell Trumbull, so that includes their lease payments, their emergency call number, things like that, just monthly operating expenses.

(*In re: Orwell-Trumbull Pipeline Co.*, January 25, 2018, 341 Meeting of Creditors Transcript, page 20, line 17 – page 22, line 9; page 23, lines 9-15; page 39, line 20 – page 40, line 18; page 41, lines 15-19; page 42, lines 1-7. A true and correct copy of the relevant pages of the foregoing transcript are attached hereto as <u>Exhibit 12</u>).

<u>*In re: Lake Shore Gas Storage Inc.*, January 25, 2018, 341 Meeting of Creditors</u>

MS. GIANNIRAKIS:     It looks like from November 1, 2016, to December 31, 2017, the Debtor paid 120,000 to OsAir?

MS. CAROTHERS:      Yes.

MS. GIANNIRAKIS:     And what was this for?

MS. CAROTHERS:      It's a related party transfer.

MS. GIANNIRAKIS:     Where did it get the money?

MS. CAROTHERS:      [OTP].

MS. GIANNIRAKIS:     So [OTP] transferred the money to Lake Shore and Lake Shore transferred the money to OsAir?

MS. CAROTHERS:      Yes.

MS. GIANNIRAKIS:     And what was it for, do you know?

MS. CAROTHERS:      I don't.

(*In re: Lake Shore Gas Storage Inc.*, January 25, 2018, 341 Meeting of Creditors Transcript, page 17, lines 9-24. A true and correct copy of the relevant pages of the foregoing transcript are attached hereto as <u>Exhibit 13</u>.)

<u>*In re: Chowder Gas and Storage Facility LLC*, January 25, 2018, 341 Meeting of Creditors</u>

MS. GIANNIRAKIS:     And what funds would come in and out of those accounts?

> MS. CAROTHERS:     The only funds that would come into the accounts would be a transfer from an intercompany like [OTP] to pay any invoices that were due.
>
> MS. COATOAM:     To pay the loan, pay the [FNB] loan payments.
>
> MS. GIANNIRAKIS: Okay. So Chowder did make payments to [FNB]?
>
> MS. CAROTHERS:     Yes.
>
> MS. COATOAM:     Yes.

(*In re: Chowder Gas and Storage Facility LLC*, January 25, 2018, 341 Meeting of Creditors Transcript, page 8, lines 5-16. A true and correct copy of the relevant pages of the foregoing transcript are attached hereto as <u>Exhibit 14</u>.)

<u>*In re: Orwell-Trumbull Pipeline Co*., February 5, 2018, Hearing on FNB's Motion to Dismiss</u>

> MR. AMEND:     So to restate my question previously, Orwell Trumbull, Cobra, Chowder, and [Lake Shore] were operated as one and the same, to use your words; correct?
>
> MS. CAROTHERS:     Yes. Everything was accounted for, but we were able to make transfers, as needed, without having to cut checks. We could just do transfers.
>
> MR. AMEND:     So if one of those four entities needed money and one of those four entities had the money, the company with the money would just give it to the one who needed the money; correct?
>
> MS. CAROTHERS:     With an accounting backup to it, yes, that's right.

(*In re: Orwell-Trumbull Pipeline Co*., February 5, 2018 Hearing Transcript, page 27, lines 14-25. A true and correct copy of the relevant pages of the foregoing transcript are attached hereto as <u>Exhibit 15.</u>).

52.     Debtor's intermingling of funds is probably most accurately depicted by the past bank records of an insider known as RMO Inc., d/b/a McKay Standard. The bank account for RMO Inc. served as, in essence, a clearing house for Debtor. Various funds from various sources were deposited into one, comingled account. RMO Inc. also transferred money to insiders on a regular basis from that same comingled account.

Further, RMO, Inc. paid various invoices on behalf of various insiders from the comingled account.

### (v)    Debtor Commingled Funds Post-petition

53.    On July 24, 2018, the Receiver, as an interested party to this action, filed a Motion for Turnover of Property [dkt # 201] in this Court. The contested matter was resolved by agreed order [dkt # 248], wherein this Court found, upon agreement of Debtor and the Receiver, that Debtor collected the following rents and comingled them in his debtor-in-possession account, all of which were not property of Debtor's bankruptcy estate: (i) $2,000 in rents belonging non-debtor insider Hamilton Partners, which rents were subject to the State Court receivership; (ii) $600 in rents on a property after relief from stay and abandonment, which rents were consequently subject to the State Court receivership; and (iii) $4,200 in rents belonging to debtor insider Wilson Land LLC.

### (vi)    Debtor Is Using Non-debtor Insiders to Create Liquidity Outside of the Purview of the Court to Avoid Creditors

54.    Debtor's failures to disclose assets and transfers such as those examples described above demonstrate a penchant for secretiveness and dishonesty. During this Case, Debtor is organizing a massive liquidity scheme using non-debtor insiders to sell or otherwise divest those non-debtors of assets to the detriment of the Debtor's estate and its creditors.

### (a)    Yellowbrick

55.    Since the filing of this Case, non-debtor insider Yellowbrick Storage LLC ("***Yellowbrick***") and/or Tin Man Storage, LLC and/or Tinman Storage Center, LLC, has sold storage units. (See Ex. 5, page 22, lines 11-21). When questioned about the

operations of Yellowbrick, Debtor was noncommittal concerning where the proceeds of

such sales go.

> MS. GIANNIRAKIS:      So your testimony is that other than the Sugarbush properties, none of your other – and not talking about the storage units, because I'll go back to those because I'm not quite sure I understand that, but none of these other businesses that you own or have an interest in have sold any property since the filing of this bankruptcy case?

> DEBTOR:      Not to my knowledge, no.

> MS. GIANNIRAKIS:      The storage units --

> DEBTOR:      Yeah.

> MS. GIANNIRAKIS:      -- explain that to me.

> DEBTOR:      Well, these are -- these are units that are 20 by 50 and there -- people -- a lot of people store their big expensive campers in there.

> MS. GIANNIRAKIS:      So you sell them, you don't lease them?

> DEBTOR:      I sell them at $45,000 per unit, you know.

> MS. GIANNIRAKIS:      That money goes into the debtor in possession account?

> DEBTOR:      No.

> MS. GIANNIRAKIS:      Where does it go?

> DEBTOR:      It just goes to pay the bills for construction of the units, you know.

>                            ***

> MR. BAIN:      You collect rents at Tinman. Is that a LLC that you own?

> DEBTOR:      Yes.

> MR. BAIN:      Tinman, LLC?

> DEBTOR:      Yeah.

> MR. BAIN:      [Yellowbrick] is also a LLC?

> DEBTOR:      Same thing, yeah.

> MR. BAIN:      Not the same company, but two different companies that you collect rents from?

| DEBTOR: | I don't know. I think it would be the same company. |
| MR. BAIN: | Are Tinman and [Yellowbrick] the same company? |
| DEBTOR: | Yeah. They do -- yes. It all goes into [Yellowbrick]. There is no Tinman. |
| MR. BAIN: | Okay. Who is paying rents? What are these rents for? |
| DEBTOR: | They're for maintenance fees and we rent some units too. |

(*Id.* at page 25, line 4 – page 26, line 1; page 47, line 11 – page 48, line 3).

**(b)    OsAir**

56.    In addition to the $75,000 termination fee OsAir received from the Sugarbush transaction, and the receipt of the Great Lakes Parkway parking lot rents, OsAir also received payment from the sale of a tractor to Debtor's nephew.

| MR. BAIN: | Have you sold any tractors? |
| DEBTOR: | Yeah. I sold some to my nephew Ossie but they were OsAir's. |
| MR. BAIN: | They were OsAir's? |
| DEBTOR: | Yeah. |
| | *** |
| MR. BAIN: | How much did Ossie pay you for this tractor? |
| DEBTOR: | Well, the tractor, 40,000. |
| MR. BAIN: | What did you do with the cash from that? |
| DEBTOR: | I don't know. You know probably went into OsAir. |

(Ex. 5 at page 61, lines 19-23; page 62, lines 19-23).

**(c)    Hamilton-Mercantile LLC Land and the OsAir Mortgages**

57.    On September 27, 2018, non-debtor insider Hamilton-Mercantile LLC ("***Hamilton-Mercantile***"), auctioned 87.40 acres of vacant land zoned industrial and located at 9499 Hamilton Drive, Mentor, Ohio, and assigned parcel number 16B0650000350.  According to the online records of the Lake County Auditor, the land

sold for $445,500. True and correct copies of the Lake County online sales data and the Warranty Deed conveying the land to the buyer are attached hereto as Exhibit 16.

58.　　At the time of the sale, the land appeared to be encumbered by a Mortgage Deed granted by Hamilton-Mercantile to another non-debtor insider OsAir in the principal face amount of $950,000 dated December 1, 2015 and recorded on March 14, 2017 as document no. 2017R006530 (the "**2017 OsAir Mortgage**"). Curiously, just nine days prior to recording the Warranty Deed conveying the land to the buyer, but after the conclusion of the auction selling the land, non-debtor insider OsAir recorded a second Mortgage Deed in the principal face amount of $950,000 dated October 10, 2018 and recorded on October 10, 2018 as document no. 2018R025797 (the "**2018 OsAir Mortgage**"). True and correct copies of the 2017 OsAir Mortgage and the 2018 OsAir Mortgage are attached hereto as Exhibit 17.

59.　　Immediately after recording the second Mortgage Deed, OsAir filed a Satisfaction of Mortgage as document no. 2018R025798, discharging the 2017 OsAir Mortgage. Finally, after recording the Warranty Deed conveying the land to the buyer, OsAir filed a second Satisfaction of Mortgage as document no. 2018R026784, discharging the 2018 OsAir Mortgage. True and correct copies of the Satisfaction of Mortgages are attached hereto as Exhibit 18.

60.　　Given Debtor's propensity for intercompany transfers between his insider entities, it is highly doubtful that any consideration was given for either the 2017 OsAir Mortgage or the 2018 OsAir Mortgage.

61.　　Oddly, a quick search on the Lake County, Ohio Recorder's online records reveals a commonly used business strategy for Debtor, encumbering real property owned by insider entities by granting mortgages to other insider entities, such as OsAir.

29

Since July 16, 2015, OsAir has recorded the following 20 separate mortgages encumbering real property owned by other insider entities:

    i.    Mortgage granted by debtor insider Wilson Land Properties LLC, recorded on July 16, 2015 as document no. 2015R018620;

    ii.    Mortgage granted by non-debtor insider Route 306 LLC, recorded on August 11, 2015 as document no. 2015R021284;

    iii.    Mortgage granted by debtor insider Wilson Land Properties LLC, recorded on August 11, 2015 as document no. 2015R021285;

    iv.    Mortgage granted by debtor insider Wilson Land Properties LLC, recorded on August 11, 2015 as document no. 2015R021286;

    v.    Mortgage granted by debtor insider Wilson Land Properties LLC, recorded on September 22, 2015 as document no. 2015R025388;

    vi.    Mortgage granted by non-debtor insider Black Bear Realty Ltd., recorded on November 19, 2015 as document no. 2015R030848;

    vii.    Mortgage granted by debtor insider Wilson Land Properties LLC, recorded on March 11, 2016 as document no. 2016R005962;

    viii.    Mortgage granted by debtor insider Wilson Land Properties LLC, recorded on March 14, 2016 as document no. 2016R006106;

    ix.    Mortgage granted by debtor insider Wilson Land Properties LLC, recorded on October 25, 2016 as document no. 2016R028043;

    x.    Mortgage granted by Debtor, recorded on October 25, 2016 as document no. 2016R028044;

    xi.    Mortgage granted by non-debtor insider 9130-38 Tyler Blvd LLC, recorded on January 12, 2017 as document no. 2017R001012;

    xii.    Mortgage granted by non-debtor insider 9130-38 Tyler Blvd LLC, recorded on January 12, 2017 as document no. 2017R001013;

    xiii.    Mortgage granted by non-debtor insider 9130-38 Tyler Blvd LLC, recorded on January 12, 2017 as document no. 2017R001014;

    xiv.    Mortgage granted by non-debtor insider Hamilton-Mercantile Land LLC, recorded on March 14, 2017 as document no. 2017R006530;

    xv.    Mortgage granted by Debtor, recorded on May 11, 2017 as document no. 2017R012081;

    xvi.    Mortgage granted by Debtor, recorded on July 5, 2017 as document no. 2017R17453;

    xvii.    Mortgage granted by Debtor, recorded on July 5, 2017 as document no. 2017R17454;

    xviii.    Mortgage granted by debtor insider Wilson Land Properties LLC, recorded on July 5, 2017 as document no. 2017R17455;

xix. Mortgage granted by non-debtor insider 2737 Hubbard Rd LLC, recorded on July 5, 2017 as document no. 2017R006530; and

xx. Mortgage granted by non-debtor insider Hamilton-Mercantile LLC, recorded on October 10, 2018 as document no. 2018R025797.

62. Each of the foregoing mortgages filed by insider OsAir encumbers real property owned by various other insiders, thereby reducing the value of said insiders and diminishing the value of the estate's interest in said insiders.

### (d) 8667 East Ave LLC

63. On November 16, 2018, non-debtor insider 8667 East Ave LLC ("**8667 East Ave**"), sold property located at 8667 East Ave., Mentor, Ohio, and assigned parcel number 16B052P000030, to another insider Jeremy Cash Osborne. According to the online records of the Lake County Auditor, the land sold for $500,000. A true and correct copy of the Lake County, Ohio Property Record Card is attached hereto as Exhibit 19.

64. The 8667 East Ave. property is no stranger to changing hands between Debtor controlled insider entities. Past owners before insider 8667 East Ave include insiders McKay Real Estate Corporation, Heisley Hopkins, OsAir, Nathan Properties LLC, and Wilson Properties LLC. *Id*.

65. Additionally, similar to the OsAir mortgages described above, the 8667 East Ave. land was recently encumbered by a mortgage granted to a former family member of Debtor. On January 8, 2015, a Mortgage was granted by 8667 East Ave., and other insiders, to Debtor's ex-wife Diane M. Osborne as document no. 2015R000416. A true and correct copy of the January 8, 2015, Mortgage is attached hereto as Exhibit 20.

31

### (vii)   Debtor Has Failed to Insure Significant Assets of the Estate

66.     When questioned about the existence of insurance coverage for all estate assets, Debtor testified that he does not, and has not maintained insurance on significant assets of the estate located in the State of Pennsylvania.  Specifically, Debtor testified as follows:

> MS. GIANNIRAKIS:   Do you still have insurance on all of your estate assets?
>
> DEBTOR:   I don't know.  I don't have insurance on the Pennsylvania stuff.
>
> MS. GIANNIRAKIS:   So that property in Pennsylvania is not insured?
>
> DEBTOR:   Right.
>
> ***
>
> MS. GIANNIRAKIS:   When is the last time you had insurance on that property?
>
> DEBTOR:   That's a good question.  I had insurance on the cabin that burned down, but I -- it's probably been four or five, six years.
>
> ***
>
> MS. GIANNIRAKIS:   Okay.  It's a problem that there's no insurance on the property.  Have you tried to get insurance?
>
> DEBTOR:   Yeah.  I have quotes on it, but it's – you know, I'm short on money, you know.  I don't know if we could take it out of the DIP account.

(Ex. 5 at page 10, line 20 – page 11, line 1; page 11, lines 18-22; page 12, lines 3-9).

67.     Interestingly, of six "cabins" located on the property in Pennsylvania, Debtor maintained property insurance on the single cabin that burned down.  The other five cabins have been without insurance for four, five or six years.

**(viii)  Debtor Has Failed to Pay Real Estate Taxes**

68.     A review of the claims register in this Case reveals Debtor's unwillingness to pay real property taxes.  Indeed, creditor Tax Ease Ohio, LLC has filed 30 separate proofs of claims representing separate tax lien certificates it has purchased.[13]

69.     Beyond these, Debtor's amended schedules [dkt # 98] reveal unpaid real property taxes to Cuyahoga County, Lake County and Portage County, Ohio in the aggregate scheduled amount of $551,058.71.

70.     Additionally, prior to initiating this Case, Debtor has allowed certain parcels of real property to go to tax foreclosure sale, and then appeared at the sale to purchase the same parcel through an insider entity to the detriment of his secured creditors.

**(ix)    Debtor is Not Trustworthy and Dishonest**

71.     Debtor is  not trustworthy and has a history of dishonesty.  A recent example is depicted through the claims to ownership of the gathering lines that feed the intrastate pipeline owned by OTP.  Non-debtor insider Rockefeller Oil Company, LLC ("**Rockefeller**") recently filed an action in the Court of Common Pleas, Lake County, Ohio, in the case known as *Rockefeller Oil Company, LLC v. Orwell-Trumbull Pipeline Co., LLC*, assigned case number 18CV000726 (the "**Rockefeller Gathering Line Action**") claiming ownership to various gathering  lines that feed the OTP pipeline.

72.     Notwithstanding Rockefeller's claims, Debtor previously testified under oath as a corporate representative of insiders OTP and Cobra in a matter before the Public Utility Commission of Ohio the complete opposite position, that the gathering

---

[13] See claim nos. 20 – 22, 24 – 27, and 37 – 59.

lines were the property of OTP. When questioned about the prior proceeding, Debtor nonchalantly admitted to the inconsistency and potential perjury as a mistake.

> MR. SINN: Have you either personally or on behalf of one of your entities ever testified under oath that the 2-inch steel gathering lines were owned by [OTP]?
>
> DEBTOR: Yeah. Yeah. That was -- but that was a mistake. You know, that was just a mistake on my part.
>
> MR. SINN: How many times have you testified?
>
> DEBTOR: Just once.
>
> MR. SINN: So you made that mistake just once?
>
> DEBTOR: First in my life.
>
> (Ex. 5 at page 76, line 20 – page 77, line 5).

73. Not only have Debtor's prior actions and treatment of creditors deteriorated any chance of creditor confidence, Debtor's willingness to give inconsistent sworn testimony depending on the situation proves Debtor to be incapable of serving as a fiduciary.

**(x) Debtor Entangles his Assets and Liabilities with the Assets and Liabilities of Insiders to the Extent that Disentanglement is Near Impossible**

74. The comingled operations and lack of formality between Debtor personally and his numerous insider entities is best elucidated by special counsel previously requested by OTP and currently requested by Debtor.[14] On January 23, 2018 in the OTP bankruptcy case, during oral argument on an application to employ special counsel, proposed special counsel gave a general description of Debtor's business practices and the personal representation of Debtor's various insider entities. Counsel summarized the morass as follows:

---

[14] See *Motion to Employ William T. Wuliger as Special Counsel* [dkt # 266]; *Application to Employ Special Counsel* [dkt #23] (OTP case);

34

> I can understand that it may be confusing to counsel. I attempted in my affidavit to spell out all of my involvement with [Debtor], but suffice it to say that during the period of time that I was representing him, these types of formalities were not necessarily observed. That I represented him and his companies, there was no problem because monies would be collected. He would -- personal monies of his would go into businesses. We were paying off Creditors. It was -- it was an ongoing relationship.

(*In re: Orwell-Trumbull Pipeline Co.*, case no. 17-17135-aih, January 23, 2018 Hearing Transcript, page 23, lines 10-19. A true and correct copy of the relevant pages of the foregoing transcript are attached hereto as <u>Exhibit 21</u>).

75.    Indeed it is confusing.  As a further example of how Debtor disregards the distinctness of corporate entities, counsel continued on to explain to this Court how a law suit filed in the Court of Common Pleas, Cuyahoga County, Ohio on behalf of Debtor personally was not, in reality, Debtor's claim.[15]  Rather, counsel explained that the real party in interest to that claim was OTP, not Debtor.  Debtor, however, was named as the plaintiff to that lawsuit instead of OTP.  This was apparently done as part of the litigation strategy solely to avoid the specific affirmative defense of jurisdictional priority that could have been raised against OTP, but not against Debtor.  According to the proposed special counsel, Debtor disregarded OTP as a separate entity entirely and named himself as the plaintiff in a lawsuit for a claim that apparently was rightfully that of OTP.  Specifically, counsel explained to this Court, in pertinent part, as follows:

> Now, why wasn't the [OTP] named as a party? Mr. Dortch had filed a similar lawsuit, but not identical, in Lake County, in which he named [OTP].  To avoid a jurisdictional priority argument, because I thought the better court was the Cuyahoga County Court, realizing the Lake County Court had no appetite -- whenever the PUCO is mentioned, they always defer. I knew that the Cuyahoga County Court could not,

---

[15] See, Richard M. Osborne v. Gas Natural, Inc., case no. CV-17-877354, Common Pleas Court, Cuyahoga County, Ohio.

> given the jurisdictional demands in the contract, and so I named [Debtor]. At the end of the day, the money would have gone to [OTP]. I don't envision any resolution that this Court wouldn't approve with the appropriate disbursements going to [OTP].

(See Ex. 21 at page 24, lines 11-24).

76.     In a memorandum in opposition filed recently in the Rockefeller Gathering Line Action (defined above), non-debtor insider Rockefeller (defined above) described Debtor's business operations as follows: "For years, [Debtor] maintained an informal and symbiotic structure with regard to his business interests. Companies shared office space, employees, equipment, gas lines, wells, and other valuable assets. At times, companies performed various services for their common benefit.  The companies also paid various expenses of each other and booked each other's operating expenses.  In short, [Debtor] conducted his businesses for years in concert with one another."[16]  True and correct copies of Rockefeller's Complaint and Memorandum in Opposition to OTP's Motion to Stay filed in the above-cited Lake County, Ohio action are attached hereto as Exhibit 22.

77.     Debtor reinforced this notion that he fails to recognize corporate distinctness between insiders when he testified as follows:

| MR. SINN: | ... your various entities were run either as the same or collaboratively. Is that standard – was that standard practice – |
|---|---|
| DEBTOR: | Yeah. |
| MR. SINN: | -- prior to the bankruptcies being filed? |
| DEBTOR: | They were run, you know, really as one unit, you know. There might have been two different, three different companies. They were really run as one unit.... |

---

[16] Rockefeller's Complaint in the Lake County action explains at further lengths the sameness of the various insiders controlled by Debtor.

(Ex. 5 at pg. 78, lines 9-18).

78.     Debtor has a history and practice of disregarding corporate and statutory distinctions and formalities of countless insider entities, and uses these insider entities merely as alter egos to carry out his individual business dealings and shield assets from his individual creditors.

79.     Beyond the prior admission of proposed special counsel that Debtor does not observe corporate formalities, employees of Debtor and/or Debtor's insiders have testified in various proceedings before this Court as follows concerning the sharing of employees between insiders:

_In re: Orwell-Trumbull Pipeline Co._, case no. 17-17135-aih, February 5, 2018, Hearing on FNB's Motion to Dismiss

| | |
|---|---|
| MR. AMEND: | ... You are currently the accounting manager for [OTP]; correct? |
| MS. CAROTHERS: | Correct. |
| MR. AMEND: | And since this Court's interim cash collateral order was entered, you've assumed the day-to-day administrative duties for the pipeline; correct? |
| MS. CAROTHERS: | That's correct. |
| MR. AMEND: | You would agree with me that prior to that order, you took your instructions from [Debtor]? |
| MS. CAROTHERS: | That's correct. |
| MR. AMEND: | And you recently testified as [OTP]'s corporate representative for purposes of a deposition in this case; correct? |
| MS. CAROTHERS: | Yes. |
| MR. AMEND: | You started working for [OTP] in approximately January 2008? |
| MS. CAROTHERS: | Correct. |

***

| | |
|---|---|
| MR. AMEND: | During the time that you've performed services for [OTP], you've also been paid by [OTP]; correct? |
| MS. CAROTHERS: | That's correct. |
| MR. AMEND: | But even though you're paid by [OTP], you perform services for a host of other entities; correct? |
| MS. CAROTHERS: | Yes. |
| MR. AMEND: | And all of those entities are owned and controlled by [Debtor]; correct? |
| MS. CAROTHERS: | Correct. |

(Ex. 16 at page 23, lines 10-19; page 24, lines 11-21).

*In re: Orwell-Trumbull Pipeline Co.*, January 25, 2018, 341 Meeting of Creditors

| | |
|---|---|
| MR. MATHENEY: | You stated that there are 13 OTP employees, and that they're full time. Are those [Cobra Pipeline] employees or are they OTP employees? |
| MS. CAROTHERS: | Well, everyone is through Orwell Trumbull's payroll as the payroll master, and then a lot of those -- of those employees actually do work for Cobra, and that's the reason for the payroll split. |
| MS. COATOAM: | It would be approximately one operator for Orwell Trumbull, plus half of the office staff. You know, half time of the office staff. |
| MR. MATHENEY: | So the 13 employees are also full-time employees for Cobra? |
| MR. SINN: | How many field operators are there for Cobra? |
| MS. CAROTHERS: | There are four. |
| MR. SINN: | And are those part of the 13 full-time employees or are those -- |
| MS. CAROTHERS: | Yes. |
| MR. MATHENEY: | So those operators also do work for OTP? |
| MS. CAROTHERS: | When needed. All of the staff is operated as one, so whenever need be, if there was an emergency on [OTP], an operator from one of the other systems of Cobra would come up and assist. |

38

| | |
|---|---|
| MR. SINN: | I did want to ask you about the obligations of the Pennsylvania Office of Unemployment. Was that for an employee in Pennsylvania? |
| MS. CAROTHERS: | Yes. |
| MR. SINN: | Who was that employee? |
| MS. CAROTHERS: | There were four employees that were on our payroll for less than a year. |
| MR. MATHENEY: | Did they work for OsAir or Oz Gas? |
| MS. COATOAM: | Oz Gas, I think. Actually – I mean, they didn't actually work for them. They just were working in PA doing cleanup and things. They were on our payroll for a short time and we didn't pay unemployment. |
| MR. SINN: | Did they ever do any work for [OTP]? |
| MS. COATOAM: | No. |

(Ex. 13 at page 32, line 6 – page 33, line 8; page 48, lines 9-25).

80.    Consistent with the employees' testimony above, in describing the use of employees for his various insider entities, the Debtor testified as follows:

| | |
|---|---|
| MS. GIANNIRAKIS: | When you provide the information from these companies to your accountant, how do you provide it? |
| DEBTOR: | Well, he takes it off the checkbook, you know. |
| MS. GIANNIRAKIS: | So you just give them the checkbook and he – |
| DEBTOR: | I have a guy that works for me, you know, Don Whiteman that works for me that reconciles the bank accounts every month .... |
| | *** |
| MS. GIANNIRAKIS: | Who pays your employee Don Whiteman – |
| DEBTOR: | I'm sorry? |
| MS. GIANNIRAKIS: | Who pays the salaries of Don Whiteman and Sherry Phillips? |
| DEBTOR: | Sherry Phillips my DIP account pays her. Okay. And then Don Whiteman is either on Rockefeller's payroll or David's payroll. |
| | *** |

39

| MR. SINN: | I believe you testified that -- is it Don Whiteman? Is that his name? |
|---|---|
| DEBTOR: | Yes. |
| MR. SINN: | He was an employee of either Rockefeller or David? |
| DEBTOR: | Yes. |
| MR. SINN: | How many employees does Rockefeller have? |
| DEBTOR: | Eight or two or three. |
| MR. SINN: | Are those field employees or office employees? |
| DEBTOR: | Well, I had to lay the field -- I laid the field employees off because Burkons cut me out of putting my gas into my own lines because he's trying to steal from me. |

***

| MR. SINN: | So now you just mentioned that you had to lay off the field employees for Rockefeller. |
|---|---|
| DEBTOR: | Yeah. |
| MR. SINN: | If Rockefeller needs money to pay for Don Whiteman – |
| DEBTOR: | Yeah. |
| MR. SINN: | -- where does that money come from? |
| DEBTOR: | It comes from OsAir or – .... |

(Ex. 5 at page 26, lines 14-21; page 67, lines 6-12; page 74, lines 20-25; page 75, lines 1-7; page 79, lines 18-25).

**(xi)  Debtor Pays Employees in Cash**

81.    In addition to sharing employees and comingling assets between insiders,

Debtor pays employees in cash:

| MR. BAIN: | Okay. Are you currently paying any of your employees in cash? |
|---|---|
| DEBTOR: | No. |
| MR. BAIN: | By "you" I mean Richard M. Osborne. |
| DEBTOR: | No. |
| MR. BAIN: | You personally. |
| DEBTOR: | No. |

| | |
|---|---|
| MR. BAIN: | Do any of your companies that you own and operate pay any of your employees in cash? |
| DEBTOR: | Sometimes. You know, weekend work and stuff. |
| MR. BAIN: | Okay. When's the last time you or any of your companies paid any employee in cash? |
| DEBTOR: | I don't know. I have to look that up. |
| MR. BAIN: | Has it been since you filed a petition for bankruptcy? |
| DEBTOR: | I don't know. |
| MR. BAIN: | Do you believe it could have been? |
| DEBTOR: | It could have been, yeah. |
| MR. BAIN: | Where would that cash have come from? |
| DEBTOR: | OsAir. |
| MR. BAIN: | So would there be a check made to you personally? How would the cash come out of OsAir? |
| DEBTOR: | I would just write a check for cash and go to the bank and cash it. It wasn't for me. |
| MR. BAIN: | Who did these employees work for that you paid in cash? |
| DEBTOR: | OsAir. |
| MR. BAIN: | All of these were OsAir employees? |
| DEBTOR: | Yeah. |
| MR. BAIN: | As OsAir employees, what were their jobs? |
| DEBTOR: | They work at the crushing yard. You know, work on the crushing plant. |
| MR. BAIN: | So any employee that you paid in cash was an employee working at the OsAir facility? |
| DEBTOR: | Right. Yeah. |
| MR. BAIN: | Okay. Have there been any other employees other than these OsAir employees working at the crushing plant that you paid in cash? |
| DEBTOR: | Not to my knowledge. |
| MR. BAIN: | Can you recall that in March 2018 that you authorized Don Whiteman or Sherry Phillips to make cash payments to four employees totaling $1,700? |
| DEBTOR: | No. |

| | |
|---|---|
| MR. BAIN: | Would you ever have made that authorization or direction to - - |
| DEBTOR: | Yeah, I could have. Yes, I could have. |
| MR. BAIN: | Okay. Where would Sherry or Don have received the cash? |
| DEBTOR: | OsAir. |
| *** | |
| MR. BAIN: | How do you know that? |
| DEBTOR: | Well, that's where it usually comes out of. |

(Ex. 5 at page 43, line 8 – page 44, line 10; page 44, lines 15-16).

**(xii) Debtor Paid Professionals Without Court Approval**

82.     During the pendency of this case, Debtor utilized the services of an accountant and paid for those services without obtaining Court approval.   Debtor testified as follows:

| | |
|---|---|
| MS. GIANNIRAKIS: | Who is your accountant? |
| DEBTOR: | Ray Onderisin. He's in Mentor. |
| MS. GIANNIRAKIS: | Who's Walthall Ray, is that -- |
| DEBTOR: | Yeah, that's – yeah. |
| MS. GIANNIRAKIS: | Is there an application to pay them? They were paid $3,350 in April. Or in -- yeah, the April monthly operating report. Did you make a payment to them in April? |
| DEBTOR: | What? I'm sorry. I didn't ... |
| MS. GIANNIRAKIS: | They were paid $3,300 in April? |
| DEBTOR: | Uh-uh. |
| MS. GIANNIRAKIS: | That was without court approval. April 6. |
| MR. SCHWIEG: | Okay. |

(Ex. 5 at page 27, lines 5-18).

83.     Debtor failed to move to employ his accountant until September 19, 2018 [dkt # 244].

**B.      Cause Exists for the Appointment Of Chapter 11 Trustee Under 11 U.S.C. § 1104(a)(1)**

84.      Section 1104(a)(1) states that the Court shall order the appointment of a trustee "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause ..."  When a debtor demonstrates fraud, dishonesty, incompetence, conflict of interest, or gross mismanagement, the appointment of a trustee is required.  *See, e.g., In re Nartron Corp.*, 330 B.R. 573 (Mich. 2005); *In re Tyronne F. Conner Corp., Inc.*, 140 B.R. 771 (E.D. Cal. 1992).

85.      A determination of "cause" under Bankruptcy Code § 1104(a) "is within the discretion of the court [based on] various interests involved in the bankruptcy proceeding." *In re Bellevue Place Assocs.*, 171 B.R. 615, 623 (Bankr. N.D. Ill.), *aff'd, Bellevue Place Assocs. V. Caisse Centrale Des Banques Populaires*, No. 94-C-5089, 1004 U.S. Dist. LEXIS 17409 (N.D. Ill. Dec. 6, 1994); see also *Comm. of Dalkon Shield Claimants v. A.H. Robins Co. Inc.*, 828 F.2d 239, 242 (4th Cir. 1987). For example, the Court may consider pre-petition activity as part of its section 1104 determination. See *In re Oklahoma Refining Co.*, 838 F.3d at 1136; see also *Rivermeadows Assocs. Ltd.*, 185 B.R. 615, 619 (Bankr. D. Wyo. 1995) ("the [Bankruptcy] Code is clear that prepetition conduct of the debtor's management may be the sole deciding factor"). Once "cause is found by a court, the appointment of a trustee under Bankruptcy Code § 1104(a)(1) is mandatory. See *Rivermeadows Assocs.*, 185 B.R. at 617.

86.      The list for "cause" found in Section 1104(a) supporting the appointment of a trustee is not exhaustive. *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 472 (3d Cir. 1998) (The word "includes" in subsection (a)(1) indicates that the examples

43

of cause are not exclusive). Thus, a Court that does not find one of the grounds specifically enumerated in Section 1104(a)(1) may still find that cause exists to appoint a trustee. See, e.g., *In re Oklahoma Refining Co*., 838 F.3d 133 (10th Cir. 1988). Courts also consider the existence of other factors including, without limitation: (1) conflicts of interest, including inappropriate relations between corporate parents and subsidiaries; (2) misuse of assets and funds; (3) inaccurate and inadequate record keeping and reporting; (4) non-filing of required documents, including lack of adequate disclosure; (5) various instances of conduct found to establish fraud or dishonesty; (6) failure to make required payments; (7) lack of credibility and creditor confidence; and (8) extreme acrimony and deep-seated animosity among the debtors and their creditors. *In re Clinton Centrifuge, Inc.*, 885 B.R. 980, 985 (Bankr. E.D. Pa. 1988). If the Court determines that cause exists under Section 1104(a)(1), there is no discretion and an impartial trustee must be appointed. *In re Russell*, 60 B.R. 42, 45 (Bankr. W.D. Ark. 1985).

87.    In this case, the factual allegations recited above demonstrate the existence of each of the factors elicited by the *Clinton Centrifuge* court.

## **CONCLUSION**

88.    Wherefore, based upon all of the foregoing, Debtor is not fit to remain as a debtor-in-possession in this Case, and the appointment of a chapter 11 trustee is warranted. Accordingly, FNB respectfully requests the entry of an Order (i) appointing a chapter 11 trustee, and (ii) granting to FNB such other and further relief as is appropriate under the circumstances.

44

Dated:  December 10, 2018                        Respectfully submitted,

                                                 /s/ *Nathaniel R. Sinn*
                                                 Matthew H. Matheney (0069974)
                                                 Gregory P. Amend (0081247)
                                                 Nathaniel R. Sinn (0088467)
                                                 Buckingham, Doolittle & Burroughs, LLC
                                                 1375 E. 9th Street, Suite 1700
                                                 Cleveland, Ohio 44114
                                                 Telephone: (216) 621-5300
                                                 Facsimile: (216) 621-5440
                                                 Email:       mmatheney@bdblaw.com
                                                              nsinn@bdblaw.com
                                                              gamend@bdblaw.com

                                                 COUNSEL FOR FIRST NATIONAL BANK OF
                                                 PENNSYLVANIA.

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 11, 2018, a true and correct copy of the foregoing was served via the Court's electronic case filing system on the following who are listed on the Court's Electronic Mail Notice List:

- Gregory P. Amend: gamend@bdblaw.com
- Alison Archer: alison.archer@ohioattorneygeneral.gov
- Adam S. Baker: abakerlaw@sbcglobal.net
- Austin B. Barnes III: abarnes@sandu-law.com
- Robert D. Barr: rbarr@koehler.law
- David T. Brady: dbrady@sandu-law.com
- LeAnn E. Covey: lcovey@clunkhoose.com
- Gregory M. Dennin: greg@gmdlplaw.com
- Richard W. DiBella: rdibella@dgmblaw.com
- Glenn Forbes: bankruptcy@geflaw.net
- Stephen R. Franks: amps@manleydeas.com
- Stephen John Futterer: sjfutterer@sbcglobal.net
- Stephen D. Hobt: shobt@aol.com
- Melody Dugic Gazda: mgazda@hendersoncovington.com
- Dennis J. Kaselak: dkaselak@peteribold.com
- Christopher J. Klym: bk@hhkwlaw.com
- Matthew H. Matheney: mmatheney@bdblaw.com
- Shannon M. McCormick: bankruptcy@kamancus.com
- Kelly Neal: kelly.neal@bipc.com
- David M. Nuemann: dnuemann@meyersroman.com
- Timothy P. Palmer: timothy.palmer@bipc.com
- Kirk W. Roessler: kroessler@walterhav.com
- John J. Rutter: jrutter@ralaw.com
- Frederic P. Schwieg: fschwieg@schwieglaw.com
- Michael J. Sikora, III: msikora@sikoralaw.com
- Andrew M. Tomko: atomko@sandhu-law.com
- Jeffrey C. Toole: toole@buckleyking.com
- Michael S. Tucker: mtucker@ulmer.com
- Maria D. Giannirakis: maria.d.giannirakis@usdoj.gov
- Scott R. Belhorn: Scott.R.Belhorn@usdoj.gov

/s/ Nathaniel R. Sinn
Nathaniel R. Sinn (0088467)